

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-12-00207-CV
_____

TEXAS WORKFORCE COMMISSION AND TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY, APPELLANTS

V.

ELNORA MOSES, APPELLEE

On Appeal from the 21st District Court
Lee County, Texas
Trial Court No. 14, 530; Honorable Terry Flenniken, Presiding

August 29, 2013

## MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Appellants, Texas Workforce Commission (TWC) and Texas Commission on Environmental Quality (TCEQ), appeal from a judgment in favor of Appellee, Elnora Moses, on her claim for unemployment benefits. In support, Appellants assert the trial court erred in reversing their denial of Moses's claim because there was substantial

evidence she was disqualified from receiving benefits. We reverse the trial court's judgment and render judgment affirming the decision of TWC.

## BACKGROUND

In July 2009, Moses, a TCEQ air examiner, reported to her supervisor, Alyssa Taylor, that she believed a lack of sleep was affecting her work performance. Moses attributed her lack of sleep to being sexually assaulted while she slept at night and she accused three co-workers. According to Moses, despite placing additional locks on her doors and bars on her windows, the sexual assaults had continued. She videotaped herself while she slept but only she appeared on the videotapes. She also told Taylor she owned a firearm and recounted an incident where she ran outside her apartment at night waving her gun after she thought she heard something. Taylor reported this information to Human Resources and the legal department of TCEQ.

Moses later filed a sexual harassment complaint against the three co-workers and, in August of 2009, gave a similar account of sexual assaults to Melissa Applegate, a Human Resources Director. Considering the efforts Moses undertook to secure her apartment and the videotape results, Applegate believed her allegations were implausible. In the meantime, Moses had also complained to the police but, upon investigation, they too found the allegations implausible and did not open a case file. As a part of that investigation, Moses was given a sexual assault examination at a hospital, but the results were negative.

In September, Applegate met with Moses and advised her that she was prohibited from confronting co-workers with her sexual assault allegations. Tony

2

Walker, a regional manager, also met with Taylor and Moses. He informed Moses that, after investigation, her allegations were found to be unsubstantiated. Moses expressed dissatisfaction with the handling of her complaint and believed more should be done. Walker advised Moses to speak to her supervisor if she needed to speak about her allegations and ordered her not to discuss the nature of her complaints with any staff and not to confront the three co-workers. Taylor indicated that speaking to her co-workers about the sexual assault allegations was destructive to the work environment and, so long as the complaints were unsubstantiated, amounted to no more than gossip.

In October, Moses confronted a co-worker against whom she had made a sexual assault complaint. The co-worker was very upset and complained to Taylor. Taylor considered Moses a disruptive influence in the office and was concerned about the safety of her co-workers. She was also concerned about Moses's mental stability and believed she needed the assistance of a mental health expert. Because Moses had disobeyed a direct order to not speak to co-workers about her sexual assault complaints, she was placed on disciplinary probation from October 5, 2009 through April 5, 2010. She was also sent home and given an opportunity to receive counseling through the Employee Assistance Program (EAP). As part of her probation, Moses was required to obtain a Return to Work Certification (RWC) before returning to work. She was also warned that failure to adhere to the probation requirements could result in termination.

In December, Dr. Strange, an EAP counselor for TCEQ's independent contractor for personnel services, Deer Oaks, issued a RWC to Moses. Among other things, the RWC required that Moses not converse with known affiliates of TCEQ regarding her complaints without first obtaining Taylor's approval (RWC #3) and she was to undergo a psychiatric evaluation within the next six months (01/01/10-07/01/10) ruling out parasomnia, borderline personality disorder, and dissociative identity disorder (RWC #5).

Dr. Strange defined parasomnia as a sleep disorder where peculiar events occur that interrupt sleep; borderline personality disorder as a condition which is often related to anger issues associated with delusional characteristics or approaches to people; and dissociative identity disorder as a condition where persons sometimes do not know who they are for periods of time. He testified he would not include any of the disorders in a RWC unless he had serious concerns whether the person suffered from the disorder. He opined that persons with borderline personality disorder might possibly be dangerous to themselves and others and, like dissociative identity, prone to bizarre behavior. He also testified he would be concerned if someone with any of the disorders owned a firearm.

When Moses returned to work in January of 2010, Taylor discussed the RWC's conditions with her numerous times. Evelyn Baker, Employee Relations Coordinator, testified Moses often questioned why she had to take a battery of tests in connection with RWC #5, the condition requiring psychiatric evaluation. Baker told Moses that the condition was a requirement to be completed before she returned to work. Baker then set Moses up with a number of psychiatrists who provided such tests. She also advised

4

Moses that she could share Dr. Strange's report, as well as Deer Oaks' information, with the psychiatrists but reiterated that Moses was not to discuss her sexual assault allegations with other employees. Moses later reported to Baker that the psychiatrist did not perform the tests or cancelled her appointments for a variety of reasons.

In February, Wendy Bass, Fleet Property Manager, started receiving weekly visits from Moses. When Moses informed Bass that male co-workers were stalking her, Bass suggested she go to Human Resources, however, Moses told her she had already been and they were no help.

In April, Taylor met with Moses to discuss her progress under the RWC and extend her probation period until July 1. Taylor was concerned Moses was exhibiting signs indicative of workplace violence per the TCEQ's policies. She believed Moses was paranoid about persons from her workplace following her home and sexually assaulting her in her sleep, and that she was desperate over recent personal issues. She also believed Moses was exhibiting an escalating emotional state and displaying anger over how her sexual assault complaints had been handled. Moses commented to Taylor several times that "she felt she was going to have to take matters into her own hands and be the aggressor." Other employees observed Moses in the parking lot walking alone while having animated conversations with herself. Taylor felt personally threatened by Moses and was concerned for her co-workers' safety. Also in April, Bass indicated Moses came to her office upset and angry because her probation was extended to July to allow her additional time to comply with RWC #5.

In May, Bass was visited again by Moses. Moses told her that male staff members had again broken into her apartment and sexually assaulted her. She accused specific employees and provided details that made Bass very uncomfortable. On one occasion, Moses came into Bass's office very upset and said "they" were worried she was going to go postal because she knew how to use a gun and went to a shooting range. Moses indicated she was skilled with a gun. Later, when Bass was passing through the front office, she observed Moses sitting with another employee who appeared distraught and realized she was not the only person affected by Moses's behavior. The weekly conversations disrupted her ability to do her work and made her uncomfortable. She also believed Moses presented a danger to other people at work and decided to speak with Walker.

In late June, Moses testified she underwent a psychiatric examination at the John Peter Smith Emergency Room. She didn't take her RWC but discussed its contents with the doctors. She did not disclose Dr. Strange's report or any information from Deer Oaks. When Taylor subsequently sought to determine her fitness to return to work by seeking a medical release to verify the psychiatric examination, Moses refused because she "didn't feel it was necessary and [she] didn't trust them." Shortly after Bass spoke to Walker, Moses was terminated for (1) violating RWC #3 (requiring her to not discuss her allegations of sexual assault with affiliates of TCEQ) and (2) failing to complete RWC #5 (requiring her to submit to a psychiatric examination). Following her discharge, additional security measures were put in place at TCEQ's regional office because of concerns Moses might take some kind of action.

Moses's application for unemployment benefits was subsequently denied by a hearing officer because she "was discharged for misconduct connected with [her] last work." TEX. LAB. CODE ANN. § 207.044(a) (West 2006). She appealed the initial determination to TWC's Appeal Tribunal. *See* TEX. LAB. CODE ANN. § 212.051, 212.102 (West 2006). The Appeal Tribunal upheld the hearing officer's decision to deny benefits and Moses appealed the Tribunal's decision to TWC. *See* TEX. LAB. CODE ANN. § 212.151(2) (West 2006). TWC subsequently affirmed the Tribunal's decision and Moses filed suit for judicial review of TWC's decision in district court. *See* TEX. LAB. CODE ANN. § 212.201(a) (West 2006). After a bench trial, the trial court reversed TWC's decision and awarded unemployment benefits to Moses. TWC and TCEQ now bring this appeal.

## DISCUSSION

Appellants contend the trial court erred in rendering judgment in Moses's favor because there was substantial evidence to support TWC's decision that Moses engaged in misconduct connected with her work thereby disqualifying her for unemployment benefits. *See* TEX. LAB. CODE ANN. § 207.044(a) (West 2006). We agree.

### STANDARD OF REVIEW

The trial court reviews TWC's decision *de novo* to determine whether there is "substantial evidence" to support the decision. TEX. LAB. CODE ANN. § 212.202(a) (West 2006). *See Mercer v. Ross,* 701 S.W.2d 830, 831 (Tex. 1986). In making this determination, the issue is not whether TWC made the correct decision; it is instead

7

"whether the evidence introduced before the trial court shows facts in existence at the time of the [TWC's] decision that reasonably support the decision," that is, whether reasonable minds could have reached the same conclusion. *Blanchard v. Brazos Forest Products, L.P. and Tex. Workforce Comm'n,* 353 S.W.3d 569, 572 (Tex.App.—Fort Worth 2011, pet. denied) (quoting *Collingsworth Gen. Hosp. v. Hunnicutt,* 988 S.W.2d 706, 708 (Tex. 1998)). Because substantial evidence is more than a mere scintilla but less than a preponderance of evidence, the evidence may preponderate against TWC's decision but still amount to substantial evidence. *City of Houston v. Tippy*, 991 S.W.2d 330, 334 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

Further, the "[r]esolution of factual conflicts and ambiguities is the province of the administrative body and it is the aim of the substantial evidence rule to protect that function." *Tex. Workforce Comm'n v. BL II Logistics, L.L.C.,* 237 S.W.3d 875, 881 (Tex.App.—Texarkana 2007, no pet.) (quoting *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984)). Thus, TWC remains the primary fact-finding body, and the reviewing court may not substitute its judgment for TWC's on controverted fact issues. *BL II Logistics, L.L.C.,* 237 S.W.3d at 878; *Edwards v. Tex. Emp't Comm'n,* 936 S.W.2d 462, 465 (Tex.App.—Fort Worth 1996, no writ). Because the determination of whether TWC's decision was supported by substantial evidence is a question of law, we review *de novo* the trial court's determination. *BL II Logistics, L.L.C.,* 237 S.W.3d at 878 (citing *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999)).

TWC's ruling also carries a presumption of validity, and the party seeking to set it aside has the burden to show it was not supported by substantial evidence. *Hunnicutt,*

8

988 S.W.2d at 708. Thus, the party seeking to overturn TWC's decision must produce evidence that conclusively negates all reasonable support for the agency's decision—on any ground offered. *BL II Logistics, L.L.C.,* 237 S.W.3d at 880. Accordingly, we may only set aside TWC's decision if it was made "without regard to the law or the facts, and, therefore, was unreasonable, arbitrary, or capricious." *Mercer,* 701 S.W.2d at 831.

### UNEMPLOYMENT BENEFITS

An employee is "disqualified for benefits if [he or she] was discharged for misconduct connected with [the employee's] last work." TEX. LAB. CODE ANN. § 207.044(a) (West 2006). "Misconduct" is defined as "mismanagement of a position of employment by action or inaction, neglect that jeopardizes the life or property of another, intentional wrongdoing or malfeasance, intentional violation of the law, or violation of a policy or rule adopted to ensure the orderly work and safety of employees." TEX. LAB. CODE ANN. § 201.012(a) (West 2006).

"Misconduct" includes conduct that is disruptive or insubordinate; *Burton v. Tex. Employ. Comm'n*, 743 S.W.2d 690, 693 (Tex.App.—El Paso 1987, writ denied), or causes an employer concern for co-workers' safety. *Hunnicutt*, 988 S.W.2d at 709-10. In making our determination whether an employee engaged in "misconduct," we focus on the adverse impact of an employee's conduct on the employer and the purpose of the Unemployment Compensation Act. *Tippy*, 991 S.W.2d at 336. *See Hunnicutt*, 988 S.W.2d at 710 (The Act's "intent and purpose [is] to provide compensation for workers who are unemployed through no fault of their own.") There is no requirement that an employer show the misconduct negatively affected the employee's work. *Murray v. Tex.*

9

*Workforce Comm'n*, 337 S.W.3d 522, 525 (Tex.App.—Dallas 2011, no pet.). The "connected with" requirement may be established by evidence that one or more acts of employee misconduct occurred while the employee was on duty or occurred on the employer's premises. *Hunnicutt*, 988 S.W.2d at 709.

Here, Moses engaged in insubordination when she violated RWC #3 and #5. Despite numerous warnings, she conversed with at least one co-worker about her complaint that male employees were sexually assaulting her in her sleep and she failed to provide verification that she underwent a psychiatric evaluation for certain disorders within the designated time period.[1] Her generalized threats and references to her skill with a firearm also created a legitimate concern among her supervisors for the safety of her co-workers. Further, given the ample time she was allowed to make an appointment and submit a report in compliance with RWC #5, we find TCEQ's response was not arbitrary and unreasonable. She was advised early on and throughout her probationary period that continued employment depended on her full cooperation and compliance with the RWC's conditions. Accordingly, we find there is substantial evidence in the record that Moses was terminated because she engaged in "misconduct" that was "connected with" her work at TCEQ's regional office. *See Hunnicutt,* 988 S.W.2d at 709-10. Appellant's single issue is sustained.

---

[1] Moses's conduct was also subject to TCEQ policies regarding professional conduct that prohibited employees from disrupting others with rudeness or gossip, engaging in disrespectful and insubordinate conduct, and threatening any employee or member of the public. Her conduct was also subject to policies regarding workplace violence that prohibited employees from engaging in verbal threats or taking physical actions which create a security hazard for others in the workplace.

**CONCLUSION**

The trial court's judgment is reversed and a judgment affirming the decision of TWC is rendered.

Patrick A. Pirtle
Justice